JS - 6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Eclipse IP LLC, <br><br> Plaintiff, <br><br> v. <br><br> McKinley Equipment Corporation, <br><br> Defendant. | No. SACV 14-742-GW(AJWx) <br><br> RULING ON MOTION TO DISMISS FOR LACK OF PATENTABLE SUBJECT MATTER (35 U.S.C § 101) |

**I. Background**

This case, filed on May 13, 2014, is one of three lawsuits remaining out of the nine related cases brought by Plaintiff Eclipse IP LLC ("Plaintiff" or "Eclipse"). The other six were voluntarily dismissed. Plaintiff accuses Defendant McKinley Equipment Corporation ("Defendant" or "McKinley") of infringing the following United States patents issued to Scott A. Horstemeyer: 7,064,681 – titled "Response Systems and Methods for Notification Systems" ("'681 Patent"); 7,113,110 – titled "Stop List Generation Systems and Methods Based Upon Tracked PCD's and Responses for Notified PCD's" ("'110 Patent"); and 7,119,716 – titled "Response Systems and Methods for Notification Systems for Modifying Future Notifications" ("'716 Patent"). Compl., Docket No. 1, Disclosure of Asserted Claims and Infringement Contentions, Docket No. 12. The '681 and '110 Patents were generated from applications that stemmed from continuations of the application that resulted in the '716 Patent, meaning that those patents have the same disclosure. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 n.3 (Fed. Cir. 2008).

On July 25, 2014, McKinley moved to dismiss the Complaint on the grounds that the asserted

claims are not directed to patentable subject matter under 35 U.S.C. § 101 ("Motion"). Docket No. 22-1. On August 14, 2014, Eclipse filed an Opposition. Docket No. 23.[1] On August 21, 2014, McKinley filed a Reply. Docket No. 24.

## II. Legal Standard

### *A. Motion to Dismiss*

A complaint may be dismissed for failure to state a claim upon which relief can be granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 558-59, 570; *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

In deciding a 12(b)(6) motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and other extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The court must

---

[1] In support of its Opposition, Eclipse submitted the Declaration of Daniel R. McClure ("McClure Decl."). Docket No. 23-1. McClure is a patent attorney who was employed at the firm that prosecuted the patents-in-suit at the U.S. Patent and Trademark Office. McClure did not draw that connection expressly and did not state whether he himself was involved in the prosecution of the patents-in-suit. His declaration, 23 pages long, is essentially a second opposition brief. While McClure has an electrical engineering degree, he has been a lawyer since 1993, and part of his asserted qualifications for providing a declaration is that he has managed the prosecution of thousands of patents and stays up to date on patent law. McClure's declaration does not say anything that could not have been said in the Opposition, other than for reasons of space. Considering it does not affect the result herein.

construe the complaint in the light most favorable to the plaintiff and must accept all factual allegations as true. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court must also accept as true all reasonable inferences to be drawn from the material allegations in the complaint. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247-48 (9th Cir. 2013); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 681; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### B. Patentable Subject Matter Under 35 U.S.C. § 101

35 U.S.C. § 101 "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, ___, 130 S.Ct. 3218, 3225 (2010). It provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

*Id.* "In choosing such expansive terms . . . modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope" "to ensure that 'ingenuity should receive a liberal encouragement.'" *Id.* (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (quoting 5 Writings of Thomas Jefferson 75–76 (H. Washington ed. 1871)) (some internal quotation marks omitted).

The "wide scope" of patent eligibility is not unlimited. Instead, the Supreme Court has invented or discovered "three specific exceptions to § 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Bilski*, 130 S.Ct. at 3225 (quoting *Chakrabarty*, 447 U.S. at 309). Although "the exceptions have defined the statute's reach as a matter of statutory *stare decisis* going back 150 years,"[2] *id.*, they have not been enumerated consistently during that

---

[2] "Statutory *stare decisis*" is a recent coinage, apparently used for the first time by Justice Scalia concurring in part in *Rita v. United States*, 551 U.S. 338, 368 (2007). Justice Ginsburg was the next to use the phrase: "Although I joined Justice SCALIA in *Rita* accepting the *Booker* remedial opinion as a matter of 'statutory *stare decisis*' . . . ." *Kimbrough v. United States*, 552 U.S. 85, 116 (2007). Justice Ginsburg's use of quotation marks could have been a comment on the novelty of the phrase, but might have simply indicated a quotation. In any event, Justice Ginsburg later used the phrase without quotation marks in *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2641 (2011). The context there makes clear that the phrase refers to the principle that "[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989).

time. Forty years ago, the list of unpatentable "basic tools of scientific and technological work" was: "[p]henomena of nature . . . , mental processes, and abstract intellectual concepts." *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012), the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). That framework is as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'" – *i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id*. at 2355 (citations omitted).

Describing this as a two-step test may overstate the number of steps involved. If the claim is not "directed" to a patent-ineligible concept, then the test stops at step one. If the claim is so directed, but we find in step two that the claim contains an "inventive concept" that "transforms" the nature of the claim into something patent eligible, then it seems that there was a categorization error in finding the claim – which is considered "as an ordered combination" – "directed to an abstract idea" in step one.

So, the two-step test may be more like a one step test evocative of Justice Stewart's most famous phrase. *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it . . . .); *cf. Alice*, 134 S.Ct. at 2357 ("In any event, we need not labor to delimit the precise contours of the 'abstract ideas' category in this case.").

Rest and relaxation prevailed in *Alice* because it was "enough to recognize that there is no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of

intermediated settlement at issue [in *Alice*]. Both are squarely within the realm of 'abstract ideas' . . . ." *Id*. at 2357 (citing to *Bilski*, 130 S.Ct. 3218). Thus, so far, the two-part test for identifying an abstract idea appears to be of limited utility, while comparisons to previously adjudicated patents – or more precisely, to past cases' characterizations of those patents[3] – have done the heavy lifting. *See also Bilski*, 130 S. Ct. at 3229 ("Rather than adopting categorical rules that might have wide-ranging and unforeseen impacts, the Court resolves this case narrowly on the basis of this Court's decisions in *Benson*, *Flook*, and *Diehr* . . . .").[4] It remains true that "[t]he life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881).

But despite its narrow holding, *Alice* did categorically establish a clear rule that had previously been subject to debate: "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S.Ct. at 2358. And before *Alice*, it was unclear to some, including the USPTO, that the framework set forth in *Mayo* applied to abstract ideas as well as to the law of nature/natural phenomena at issue in *Mayo*. *See* Memo to Patent Examining Corps from Andrew H. Hirschfeld, Deputy Commissioner for Patent Examination Policy, Preliminary Examination Instructions in view of the Supreme Court Decision in *Alice Corporation Pty. Ltd. v. CLS Bank International, et al.* (June 25, 2014), *available at* http://www.uspto.gov/patents/announce/alice_pec_25jun2014.pdf.[5]

And, while the boundaries of the judicial exceptions remain subject to further development, the Supreme Court has clearly stated the policy underlying those exceptions, i.e. avoiding patents

---

[3] *Mayo* noted that, as to the patent-ineligible approach of simply instructing artisans "to apply" unpatentable subject matter, "[t]he process in *Diehr* was not so **characterized**; that in *Flook* was **characterized** in roughly this way." 132 S. Ct. at 1299-1300 (emphasis added).

[4] Scholars have argued that "the *Mayo* decision has revived the *Flook* approach, although without displacing *Diehr* or explaining how the two apparently contradictory decisions can be reconciled." Brief of Professors Peter S. Menell and Jeffrey A. Lefstin as Amici Curiae in Support of Respondents, *Alice Corp. Pty, Ltd. v. CLS Bank Int'l*, No. 13-298, 2014 U.S. Briefs LEXIS 784 at 10 (Feb. 27, 2014).

[5] Indeed, in the USPTO's view, *Alice*'s embrace of the *Mayo* framework for abstract idea cases was such a significant change or clarification that it has withdrawn issued notices of allowance – that is, stopped patents that had made it all the way through examination and were about to issue – "due to the presence of at least one claim having an abstract idea and no more than a generic computer to perform generic computer functions." USPTO Commissioner for Patents Peggy Focarino, Update on USPTO's Implementation of 'Alice v. CLS Bank' (Aug. 4, 2014), *available at* http://www.uspto.gov/blog/director/entry/update_on_uspto_s_implementation.

that "too broadly preempt the use of a natural law [or abstract idea]." *Mayo*, 132 S.Ct. at 1294. Thus, patent law should "not inhibit further discovery by improperly tying up the future use of laws of nature [or abstract ideas]." *Id*. at 1301.

*Mayo* discussed the Supreme Court's 1854 decision upholding many of Samuel Morse's telegraph patent claims, but invalidating the most general claim, which covered "the use of the motive power of the electric or galvanic current . . . however developed, for making or printing intelligible characters, letters, or signs, at any distances." *Id*. The Supreme Court presciently explained that such a claim would inhibit, rather than promote, the progress of the useful arts:

> For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification. His invention may be less complicated – less liable to get out of order – less expensive in construction, and in its operation. But yet if it is covered by this patent the inventor could not use it, nor the public have the benefit of it without the permission of this patentee.

*Id*. (quoting *O'Reilly v. Morse*, 15 How. 62, 113 (1854).) True, patents always present some impediment to follow-on innovation. The principle is one of balance: patents should not "foreclose[] more future invention than the underlying discovery could reasonably justify." *Mayo*, 132 S.Ct. at 1301.

Of course, § 101 is not the sole, or even primary, tool to ensure that balance. Every condition of patentability set forth in the Patent Act acts to ensure that patents promote, rather than retard, the progress of science and useful arts. For example, in a manner quite similar to recent § 101 jurisprudence, "[t]he written description requirement guards against claims that 'merely recite a description of the problem to be solved while claiming all solutions to it and . . . cover any compound later actually invented and determined to fall within the claim's functional boundaries.'" *Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, __ F.3d __, 2013-1338, 2014 WL 2937477, 11 (Fed. Cir. July 1, 2014) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010)).

However, scholars have argued that the written description and enablement doctrines of § 112, as currently applied, do not adequately prevent unwarranted obstructions to follow-on innovation, and have urged that § 101 can and should do so. *See, e.g.*, Lemley et al., *Life After*

*Bilski*, 63 Stan. L. Rev. 1315, 1330 (2011) (cited in *Mayo*, 132 S.Ct. at 1301-03, 1304); *but see* Lemley, *Point of Novelty*, 105 Nw. U. L. Rev. 1253, 1279 (2011) ("[T]here is good reason to worry about overbroad patent claims that lock up a wide swath of potential future applications. But the enablement and written description doctrines largely address that concern.").

In any event, the Supreme Court has spoken, and § 101 now plays an important limiting role. But District Courts and the Federal Circuit are now left with the task of figuring out when the "two-part" test is satisfied. Perhaps something like the function-way-result test used to evaluate infringement under the doctrine of equivalents might be useful. Thus, in one long-standing formulation, an accused instrumentality infringes "if it performs substantially the same function in substantially the same way to obtain the same result." *Union Paper-Bag Mach. Co. v. Murphy*, 97 U.S. 120, 125 (1877); *InTouch Technologies, Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1343 (Fed. Cir. 2014).

The test in practice often focuses on the "way" aspect of the test, because function and result are often identical in the patent and accused product, and the question is whether the accused infringer uses the same "way." Laura A. Handley, *Refining the Graver Tank Analysis with Hypothetical Claims: A Biotechnology Exemplar*, 5 Harv. J.L. & Tech. 36 (1991) ("In practice, the second prong of the test – 'substantially the same way' is often emphasized, since most infringement suits result from competition for a given market niche which dictates the 'function' and 'result' prongs.") (citing *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1531 (Fed. Cir. 1987)).[6]

Similarly, the question in the abstract idea context is whether there are other *ways* to use the abstract idea in the same field. If so, the Supreme Court has expressly encouraged others to find those other ways, without being held back by patents that preempt the whole concept. *Mayo*, 132 S.Ct. at 1294 (citing *O'Reilly*, 15 How. at 113); *Alice*, 134 S.Ct. at 3258 (noting "the pre-emption concern that undergirds our § 101 jurisprudence.").

---

[6] *Perkin-Elmer* held that "repeated assertions that the claimed and accused devices perform substantially the same function and achieve substantially the same end result are not helpful. That circumstance is commonplace when the devices are sold in competition. That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way." 822 F.2d at 1532 n.6.

Concomitantly, we must be wary of facile arguments that a patent preempts all applications of an idea. It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea, especially a way that is "less complicated – less liable to get out of order – less expensive in construction, and in its operation." *O'Reilly*, 15 How. at 113. But the patent law does not privilege the leisure of an infringer over the labors of an inventor. Patents should not be casually discarded as failing § 101 just because the infringer would prefer to avoid the work required to develop non-infringing uses of the abstract idea.

**III. <u>Analysis</u>**

### *A. The Motion is Ripe*

Both parties acknowledge that a District Court has broad discretion concerning the appropriate time to address § 101. Mot., Docket No. 22-1 at 2, Opp'n, Docket No. 23 at 10. Here, each party, according to its position, cites cases in which a court has either granted a § 101 motion to dismiss or decided that § 101 is better considered later in the case. *Id*. The Federal Circuit has stated that "it will ordinarily be desirable – and often necessary – to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Serv's, L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). But that is true only where claim construction disputes are relevant to the § 101 question.

Here, Plaintiff's argument that the Court needs to conduct further claim construction proceedings before deciding the motion decidedly fails. Eclipse argues that there is a "factual dispute whether the preambles of the asserted claims are limiting." Opp'n, Docket No. 23 at 11. But as McKinley points out, claim construction is presently not a question of fact. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77 (Fed. Cir. 2014). And to the extent extrinsic facts could be relevant, Eclipse does not identify them. Also, "McKinley is fine with hav[ing] the Court assume that the preambles are limiting . . . ." Reply, Docket No. 24 at 7.

Further, in a nonprecedential case decided after *Alice*, Judge Mayer of the Federal Circuit issued a concurring opinion extolling the virtues of early § 101 practice:

> From a practical perspective, there are clear advantages to addressing section 101's requirements at the outset of litigation. Patent eligibility issues can often be resolved without lengthy claim construction, and an early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation.

*I/P Engine, Inc. v. AOL Inc.*, 2013-1307, 2014 WL 3973501, *12 (Fed. Cir. Aug. 15, 2014). In appropriate cases, those considerations counsel entertaining § 101 at the motion to dismiss stage. Here, based on the substance of the parties arguments and the content of the patents, this Court would find that neither separate claim construction proceedings nor further development of the factual record are required before addressing the § 101 issue.

### B. The Asserted Claims of the Patents-in-Suit Fail § 101

Eclipse asserts '681 Patent claims 1, 3, 4, and 6, '110 Patent claims 1, 2, 7, and 8, and '716 Patent claims 1, 2, 4, 6, 7, 18, 19, 20, 41, 43, 44, 45, and 46. *See* Disclosure of Asserted Claims and Infringement Contentions, Docket No. 12 at 1-2.

#### 1. The '681 Patent

The asserted independent claim of the '681 Patent, claim 1, is:

> A method for communications in connection with a computer-based notification system, comprising:
> initiating a notification communication to a personal communications device ["PCD"] associated with a party, the notification communication relating to a task to be performed;
> during the notification communication, receiving a response from the party's personal communications device, indicating whether or not the party associated with the personal communications device will perform the task;
> when the party is willing to perform the task, refraining from sending any further notification communications to provoke performance of the task and monitoring for detection of one or more events to indicate accomplishment of the task by the party, the one or more events comprising at least one of the following: receipt of a second communication from the party's personal communications device; expiration of a predefined time period; or arrival or departure of a mobile thing at or from a location, respectively; and
> when the party is not willing to perform the task, initiating another notification communication to another personal communications device associated with another party in order to request assistance in the task from the another party.

McKinley characterizes the claims of the '681 Patent as directed to the abstract idea of "asking someone if they are available to perform a task and then either waiting for them to complete it or contacting the next person." Mot., Docket No. 22-1 at 6. McKinley correctly points out that all of the recited steps in claim 1 can be performed by a person talking on the phone. Mot., Docket

No. 22-1 at 7. The claim recites that the method is performed "in connection with a computer-based notification system," which Eclipse argues saves the claims because "every asserted claim of the '681 patent requires a specially programmed computer system and a specially-equipped PCD to implement the invention and to achieve its benefits." Opp'n, Docket No. 23 at 14. Not so. The specification teaches in one place that a personal communications device is a broad category that includes telephones, pagers, computers, and personal data assistants ("PDAs"). '681 Patent 3:42-43. And in another, the specification is even more expressly sweeping:

> Nonlimiting examples of PCDs [ ] are as follows: a personal computer (PC) capable of displaying the notification through e-mail or some other communications software, a television, a wireless (e.g., cellular, satellite, etc.) or non-wireless telephone, a pager, a personal data assistant, a navigation system in a motor vehicle, a radio receiver or transceiver, or any other device capable of notifying the user with some type of user perceptible emission.

'681 Patent 19:21-28. Thus, the specification belies Eclipse's argument that the claims require a "specially-equipped PCD." Instead, the claims, read in light of the specification, were deliberately drafted to recite hardware in only the most generic sense. Recitation of such generic hardware is insufficient:

> [T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. Stating an abstract idea "while adding the words 'apply it'" is not enough for patent eligibility. Nor is limiting the use of an abstract idea "'to a particular technological environment.'" Stating an abstract idea while adding the words "apply it with a computer" simply combines those two steps, with the same deficient result. Thus, if a patent's recitation of a computer amounts to a mere instruction to "implemen[t]" an abstract idea "on . . . a computer," that addition cannot impart patent eligibility. This conclusion accords with the pre-emption concern that undergirds our § 101 jurisprudence. Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of "additional featur[e]" that provides any "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.

*Alice*, 134 S. Ct. at 2358.

That analysis fits the '681 Patent's claims precisely. The claims are directed to the abstract idea of asking someone whether they want to perform a task, and if they do, waiting for them to complete it, and if they do not, asking someone else. The claims also direct that the method be performed "in connection with a computer system." There are likely a myriad number of ways to do so, and the '681 Patent preempts them all. The claims capture that broad scope without any "inventive concept" or other limiting principle. Of course, the computers used to implement the idea

will have to be "specially programmed" to carry out the instructions. But that is true of all computer-implemented inventions. A patent applicant may not "claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept." *Alice*, 134 S. Ct. at 2359.

The '681 Patent claims are analogous to Samuel Morse's rejected claim 8, which is:

> I do not propose to limit myself to the specific machinery or parts of machinery described in the foregoing specification and claims; the essence of my invention being the use of the motive power of the electric or galvanic current, which I call electro-magnetism, however developed for marking or printing intelligible characters, signs, or letters, at any distances, being a new application of that power of which I claim to be the first inventor or discoverer.

*O'Reilly,* 56 U.S. 62 at 112. The statement that "I do not propose to limit myself to the specific machinery or parts of machinery described in the foregoing specification and claims" is implicit in modern claim construction principles. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (courts should avoid reading limitations from the specification into the claims). And Eclipse's claims are even more overreaching, because the inventor here, Horstemeyer, was not even "the first inventor or discoverer" of the underlying abstract idea to which the claims are directed. And even if Horstemeyer was the first to discover the idea that you could use a computer system and a telephone to ask people whether they wanted to perform a task, those devices are generic and ubiquitous, and in the modern world, reciting them does not overcome the abstractness problem. *Alice* 134 S. Ct. at 2358; *see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 993 (Fed. Cir. 2014) ("The 'telephone' recited in claim 1 is not a specific machine, and adds nothing of significance to the claimed abstract idea.").

Nor do the specific examples given in the specification matter, as Eclipse urges they do. Opp'n, Docket No. 23 at 15-16. In fact, the Federal Circuit has specifically rejected that argument:

> Regarding Accenture's argument concerning the complexity of the specification, including the specification's detailed software implementation guidelines, the important inquiry for a § 101 analysis is to look to the claim. . . . The limitations of claim 1 are essentially a database of tasks, a means to allow a client to access those tasks, and a set of rules that are applied to that task on a given event. Although the specification of the '284 patent contains very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer. The limitations of the system claims of the '284 patent do not provide sufficient additional features or limit the abstract concept in a meaningful way. In other words,

> the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method.

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 2871 (2014).

Nor do the dependent claims contain any additional sufficient "inventive concept." The additional content of each is analyzed in the following chart.

| Claim | Language | Analysis |
|---|---|---|
| '681 Patent claim 3 | The method of claim 1, wherein the steps are performed with a single computer system, a plurality of computers that are communicatively coupled, or a computer system having a distributed architecture. | This merely makes clear that a computer implementation is required, which Eclipse argues is already inherent in the preamble to claim 1. Opp'n, Docket No. 23 at 20. |
| '681 Patent claim 4 | The method of claim 1, wherein the response is generated by a physical action taken by the party associated with the personal communications device. | This is just reciting the fact that a human is involved. Every human generated response, including talking, is a physical action. |
| '681 Patent claim 6 | The method of claim 1, further comprising the step of refraining from sending notification communications to one or more additional personal communications devices, once receiving the response. | No inventive concept or specific technology is added here. |

Therefore, the Court would hold asserted '681 Patent claims (1, 3, 4, and 6) fail to satisfy 35 U.S.C. § 101.

### 2. The '716 Patent

The three asserted independent claims of the '716 Patent are claims 1, 18, and 41. '716 Patent claim 1 reads as follows:

> A method for communications in connection with a computer-based notification system, comprising the steps of:
> initiating a notification communication to a personal communications device associated with a party;
> receiving a response communication from the party's personal communications device,
> indicating that the party has received the notification communication and is now occupied with a task associated with the notification communication; and
> refraining from sending any further notification communications to the party's personal communications device, until detection of one or more events that indicate that the party is no longer occupied with the task and can perform

another task associated with another notification communication.

This claim is directed to the abstract idea of asking someone to do a task, getting an affirmative response, and then waiting until the task is done, "while adding the words 'apply it with a computer'." *Alice*, 134 S.Ct. at 2358; *see also Planet Bingo, LLC v. VKGS LLC*, __ Fed. Appx. __, 2014 WL 4195188, *3 (Fed. Cir. Aug. 26, 2014) (holding claims' recitation of "'a computer with a central processing unit,' 'a memory,' an 'input and output terminal,' 'a printer,' and 'a program . . . enabling' the steps of managing a bingo game" irrelevant to § 101, and rejecting patentee's argument that the invention requires "complex computer code with three distinct subparts" because those programs were not recited in the claims).

'716 Patent claim 1 covers: "Fred, could you take out the trash?"; "Doing it, Ted"; [Ted says nothing further until Fred comes back without the trash], "applied with a computer notification system." It therefore fails § 101. '716 Patent independent claim 18 is indistinguishable from claim 1, so it also fails § 101.[7]

'716 Patent independent claim 41 adds the idea of "monitoring travel data associated with a mobile thing" and "initiating a second notification . . . based on upon the upon [sic] the relationship of the mobile thing or another mobile thing to the location or another location." The claim in full reads as follows:

> A method for communications in connection with a computer-based notification system, comprising the steps of:
> monitoring travel data associated with a mobile thing;
> initiating a first notification communication to a personal communications device associate [sic] with a party based upon the relationship of the mobile thing to a location;

---

[7] '716 Patent claim 18 reads as follows:

> A method for communications in connection with a computer-based notification system and a personal communications device associated with a party, comprising the steps of:
> receiving a notification communication with the personal communications device associated with the party from the notification system;
> communicating a response communication from the party's personal communications device, indicating that the party has received the notification communication and is now occupied with a task associated with the notification communication; and
> causing the notification system to refrain from sending any further notification communications to the party's personal communications device, until detection of one or more events, indictating [sic] that the party is no longer occupied with the task and can perform another task associated with another notification communication.

-13-

        receiving a response communication from the party's personal communications device;
        refraining from sending notification communications to the party's personal communications device after receiving the response communication; and
        initiating a second notification communication to the party's personal communications device, one or more other personal communications devices, or both, based upon the upon the [sic] relationship of the mobile thing or another mobile thing to the location or another location.

In the above example, this just adds Ted looking outside to see whether the trash can is now out at the curb. Or, the hotel calling the room to let a guest know that the bags have not yet arrived, and then calling again once they have. Or that the car is now at the valet stand. Again, the fact that the claim calls for this to be done "in connection with a computer-based notification system" is irrelevant. The Court would therefore find that '716 Patent claim 41 also fails § 101.

The dependent claims fare no better. The additional content of each is analyzed in the chart below.

| Claim | Language | Analysis |
|---|---|---|
| '716 Patent claim 2 | The method of claim 1, wherein the one or more events comprises at least receipt of a second communication from the party's personal communications device. | No additional inventive step. |
| '716 Patent claim 4 | The method of claim 1, wherein the one or more events comprises at least arrival or departure of a mobile thing at or from a location, respectively. | Same analysis as for independent claim 41. |
| '716 Patent claim 6 | The method of claim 1, wherein the step of initiating the notification communication is performed when a mobile thing is a predetermined proximity with respect to a location. | Same analysis as for independent claim 41. |
| '716 Patent claim 7 | The method of claim 1, wherein the steps are performed with a single computer system, a plurality of computers that are communicatively coupled, or a computer system having a distributed architecture. | This merely makes clear that a computer implementation is required, which Eclipse argues is already inherent in the preamble to claim 1. Opp'n, Docket No. 23 at 20. |
| '716 Patent claim 19 | The method of claim 18, wherein the response communication is generated by a physical action taken by the party associated with the personal communications device. | This is just reciting the fact that a human is involved. Every human generated response, including talking, is a physical action. |

-14-

| Claim | Language | Analysis |
|---|---|---|
| '716 Patent claim 20 | The method of claim 18, wherein the response communication is generated by physically detecting the presence of the party associated with the personal communications device. | This adds: [Sees Fred return] "Thanks, Fred!" <br><br> And even if the claim were construed to require that the computer system automatically detect the presence of the party associated with the personal communications device without human operator interaction, the claim covers every possible way of doing so, untethered to any specific hardware—it is purely generic. |
| '716 Patent claim 43 | The method of claim 41, wherein the step of initiating the first notification communication is performed when a mobile thing is a predetermined proximity with respect to the location. | Same analysis as for independent claim 41. |
| '716 Patent claim 44 | The method of claim 41, wherein the steps are performed with a single computer system, a plurality of computers that are communicatively coupled, or a computer system having a distributed architecture. | This merely makes clear that a computer implementation is required, which Eclipse argues is already inherent in the preamble to claim 1. Opp'n, Docket No. 23 at 20. |
| '716 Patent claim 45 | The method of claim 41, wherein the response communication is generated by a physical action taken by the party associated with the personal communications device. | Same analysis as for '716 patent claim 19. |
| '716 Patent claim 46 | The method of claim 41, wherein the response communication is generated by physically detecting the presence of the party associated with the personal communications device. | Same analysis as for '716 patent claim 20. |

Therefore, the Court would hold that the asserted '716 Patent claims (1, 2, 4, 6, 7, 18, 19, 20, 41, 43, 44, 45, and 46) fail to satisfy 35 U.S.C. § 101.

### 3. The '110 Patent

The asserted independent claim of the '110 Patent, claim 1, is:

A method for a notification system, for a transportation vehicle comprising the steps of:
monitoring travel data associated with a first personal communications device;
initiating a notification communication session to a plurality of personal communications devices, the notification communication session including a

-15-

>    message requesting a response;
> receiving responses from one or more of the plurality of personal communications devices; and
> producing a list of stops for a vehicle route for the first personal communications device, based upon the responses, the lack of responses, or a combination thereof.

McKinley points out that all of these steps could be performed by a person using any number of generic communications devices. Mot., Docket No. 22-1 at 10.

> A dispatcher could (for example) [a] monitor the location of personal communications devices (e.g., cell phones or radios) in a set of vehicles (e.g., taxis) and then [b] initiate communications to groups of them including by sending a message requesting a response (e.g., "please let me know if you are available for a pick up at 312 North Spring Street"). The dispatcher could then [c] receive a response from one or more of the communication devices (e.g., "yes I can") and [d] produce a list of stops for the vehicle (e.g., "312 North Spring St. and LAX") based upon the response.

*Id.* (emphasis omitted). Eclipse responds that the preamble is limiting, but Eclipse does not explain how treating "for a notification system for a transportation vehicle" as a limitation changes the result. Opp'n, Docket No. 23 at 23. Indeed, McKinley's argument already addressed that requirement. And Eclipse responds that "[t]he specification only discloses computer-based notification systems and provides no indication that notification systems that are not computer-based should be within the scope of the claim." *Id.* at 23-24 (citing *Phillips*, 415 F.3d at 1313-17).

That is irrelevant. The claim is directed to the abstract idea of asking people, based on their location, to go places. Once again, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. Nor can the generic recitation to "a transportation vehicle" save the claims. For purposes of § 101, conventional steps, no matter how tangible, are disregarded. *Mayo*, 132 S.Ct. at 1298

The dependent claims do not add a patentable inventive concept. The additional content of each is analyzed in the following chart.

| Claim | Language | Analysis |
| --- | --- | --- |
| '110 Patent claim 2 | The method of claim 1, further comprising the steps of:<br>    producing the list at a computer that is remote from the first personal communications device; and<br>    communicating the list to the first personal communications device. | This merely confirms that a computer is involved in producing the list of stops. The role of the computer and its inadequacy in the § 101 analysis has been discussed above. |

| Claim | Language | Analysis |
|---|---|---|
| '110 Patent claim 7 | The method of claim 1, wherein each of the responses indicate whether or not a party associated with the notified personal communications device is willing to accept responsibility for a pickup or delivery at a stop location or meet a first party associated with the first personal communications device at the stop location. | "Yes, Ted, I will pick up Ned." Or, "Yes, Ted, I will meet you there." |
| '110 Patent claim 8 | The method of claim 7, wherein the stop location is remote from the locations of the first and second personal communications devices. | No additional inventive step. |

Therefore, the Court would hold the asserted '110 Patent claims (1, 2, 7, and 8) fail to satisfy 35 U.S.C. § 101.

## IV. Conclusion

For the foregoing reasons, the Court would GRANT the Motion and DISMISS the case because '681 Patent claims 1, 3, 4, and 6, '716 Patent claims 1, 2, 4, 6, 7, 18, 19, 20, 41, 43, 44, 45, and 46, and '110 Patent claims 1, 2, 7, and 8 fail to satisfy 35 U.S.C. § 101.

Dated: This 4th day of September, 2014.

_____
GEORGE H. WU
United States District Judge